AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Darline Azamat Singh | ) ) | Case No.  4:26-mj-70556 MAG |
| | ) ) ) ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 15, 2022 and Nov. 12, 2022___ in the county of ___Contra Costa___ in the ___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud<br>    Max. pen.: 20 years prison; $250,000 fine or twice gross gain or loss;<br>    3 years S/R; restitution, forfeiture, $100 special assessment. |
| 18 U.S.C. § 1957 | Engaging in a monetary transaction with property derived from specified unlawful activity<br>    Max. pen.: 10 years prison; $250,000 fine or twice amount of criminally<br>    derived property; 3 years S/R; restitution; forfeiture; $100 special assess. |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Christopher Calley

**FILED**

Apr 22 2026

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

☑ Continued on the attached sheet.

Approved as to form ___/s/ Noah Stern___
AUSA ___Noah Stern___

_/s/ Christopher Calley_
_____
Complainant's signature

Christopher Calley, FBI Special Agent
_____
Printed name and title

Sworn to before me by telephone.

Date: ___04/22/2026___

City and state: ___Oakland, California___

_____
Judge's signature

Hon. Kandis A. Westmore, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT

I, Christopher Calley, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby declare as follows:

### OVERVIEW AND AGENT BACKGROUND

1.    I make this affidavit in support of a Criminal Complaint against DARLINE AZAMAT SINGH ("SINGH") alleging the following violations:

a.  Count One: Wire Fraud for causing an interstate wire communication in furtherance of a scheme beginning on a date unknown but no later than June 2022 and continuing through in or about November 2022 to defraud Victim 1 of money in connection with SINGH's former company, Zola Hospice, in violation of 18 U.S.C. § 1343.

b.  Count Two:  Engaging in a monetary transaction in property derived from specified unlawful activity for the transfer through financial institutions of $61,226.69 of funds received from SINGH's scheme to defraud to the bank account of an automobile dealership on or about November 12, 2022.

For the reasons set forth below, I believe there is probable cause to believe SINGH has committed the foregoing violations of federal law.

2.    I am familiar with the facts and circumstances of this investigation through my participation in it as well as my review of documents and records, meetings with witnesses, and conversations with other law enforcement agents and officers.  The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit summarizes such information in order to show that there is probable cause to believe that SINGH has committed the violation listed above.  This affidavit does not purport to set forth all of my knowledge about this matter or to name all of the persons who participated in these crimes.  The

1

affidavit also reflects my current understanding of facts based on my participation in this investigation, but that understanding may change as the investigation continues.

3.      I am a Special Agent ("SA") of the FBI and have been so employed since December 2021. Prior to becoming an FBI SA, I received a Bachelor of Arts in Anthropology and Economics from The University of California Santa Cruz, as well as a Master's in Public Affairs from Brown University. Since 2022, I have been assigned to the complex financial crimes squad in the San Francisco Field Office. My primary responsibilities as an SA are the investigation of white-collar crimes including investment fraud, corporate embezzlement, securities fraud, and bank fraud, and the execution of arrest and search warrants under the authority of the United States.

### APPLICABLE LAW

4.      Title 18, U.S.C. § 1343 prohibits wire fraud.  The essential elements of this offense are: (1) the defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made or facts omitted as part of the scheme were material, that is they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and (4) the defendant used, or caused to be used, a wire communication to carry out, or attempt to carry out an essential part of the scheme.

5.      Title 18, U.S.C. § 1957 prohibits engaging in monetary transactions in property derived from specified unlawful activity.  The essential elements of this offense are: (1) the defendant knowingly engaged or attempted to engage in a monetary transaction; (2) the defendant knew the transaction involved criminally derived property; (3) the property had a value greater than $10,000; (4) the property was in fact derived from a specified unlawful activity (in this case, wire fraud); and (5) the transaction occurred in the United States.  For purposes of the statute, a monetary transaction is the deposit, withdrawal, transfer, or exchange,

2

in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution. A financial institution includes, among other things, an insured bank or a commercial bank.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Background

6. The defendant, Darline Azamat Singh ("SINGH"), founded Zola Hospice LLC ("Zola"), a company that listed its primary address as San Francisco, California. SINGH served as the primary owner of Zola and its Chief Executive Officer.

7. The entity identified in this affidavit as "Victim 1," was an investment firm located in New York, New York.

8. The entity identified in this affidavit as "Hospice Company 1" was a hospice care company located in Napa, California that had a license to operate a hospice from the California Department of Public Health, which was effective in or around March 2021 and was set to expire in or around March 2023.

9. The entity identified in this affidavit as "Automobile Dealer 1" was an automobile dealership that maintained a bank account in the Northern District of California at Bank 1.

10. In or around 2020, SINGH registered Zola with the California Secretary of State. At the time, SINGH worked for another hospice company. SINGH began soliciting investments for Zola, telling investors that Zola would provide hospice services in multiple counties in the San Francisco Bay Area. SINGH applied for a hospice license on behalf of Zola from the California Department of Public Health. However, in or around October 2021, California enacted a law placing a moratorium on new hospice licenses, which became effective on January 1, 2022. SINGH pivoted to attempt to acquire an existing hospice business with an active hospice license.

11. By about early 2022, SINGH had left her full-time job at the hospice company at which she had been working. SINGH continued to solicit investments in Zola and worked to hire employees and set up business structures. In approximately February and March 2022,

3

SINGH hired numerous employees for multiple Zola branches, including nurses, chaplains, and office managers.  SINGH also rented office space for multiple Zola branches.  Because Zola did not have a license to operate and treat patients, Zola employees spent their time watching training videos, learning how to work for a hospice agency, and setting up business processes; not providing patient services.

12.     Zola and SINGH had insufficient funds to pay Zola's expenses and, as early as approximately March and April 2022, Zola was paying employees late or not at all.  By approximately June 2022, approximately all of Zola's employees had been laid off or resigned and Zola's operations—to the extent they had ever existed—effectively shut down.

13.     In or around June 2022, SINGH negotiated with the owner of Hospice Company 1 for Zola to purchase Hospice Company 1 and its hospice license.  On or about June 8, 2022, SINGH executed an agreement with the owner to purchase Hospice Company 1 and its license for $625,000, in the form of $300,000 cash at closing and a $325,000 note secured by Zola's assets.  SINGH never closed the transaction because she failed to send the required payment.  Hospice Company 1's owner then sold Hospice Company 1 to another purchaser.

14.     On or about June 10, 2022, an email was sent from SINGH's Zola Hospice email account to "Zola Hospice All Staff" and others purporting to be from SINGH's sister.  The email stated "I'm reaching out to inform you that [Darline] is in a critical condition after episodes of cardiac arrest in the early hours of this morning.  My family has been advised that it is a good time to say our final words to her today."  It concluded "On behalf of our family we ask for privacy as we spend the time we have left with Darline and her unborn child."  I have spoken with individuals close to SINGH, including her spouse at the time, who stated that the claims made in the email message were not true.  I have also reviewed a letter signed by SINGH's sister who purported to write the email disclaiming that she authored the above-described email.  Based on this and on my investigation, I believe that SINGH sent this email to avoid paying employees wages owed to them and to close Zola down without argument.

### B. The Scheme to Defraud

15.    In approximately June 2022, SINGH began providing false information about Zola to business brokers in an attempt to obtain funding for Zola. At the time Zola had no license to operate, no patients, and no revenue or accounts receivable. SINGH, however, falsely represented to the brokers that Zola was operating as a hospice services business, had enrolled patients, and had significant accounts receivable from invoices that had been issued to Medicare. The brokers identified Victim 1 as an entity that had potential interest in purchasing Zola's accounts receivable through an arrangement called a factoring facility. Generally, a factoring facility is a credit facility in which an investor purchases unpaid invoices. The investor will typically advance the company a large percentage of the invoice value immediately in exchange for the right to receive the money ultimately paid on the invoice.

16.    On or about June 24, 2022, SINGH executed a term sheet on behalf of Zola with Victim 1 setting forth the general terms of a factoring facility, which set forth an exclusive negotiating period and diligence process. The term sheet required Zola to pay Victim 1 a deposit of $15,000 in connection with the expenses Victim 1 would incur to perform due diligence on Zola.

17.    I reviewed documents indicating that SINGH caused this due diligence fee to be paid in a number of separate transactions. According to an email sent by one of the business brokers who connected SINGH and Victim 1 to Victim 1, Zola had confirmed making payments for diligence as follows:

| Date | Amount |
|------|--------|
| July 8, 2022 | $2,800 |
| July 25, 2022 | $1,100 |
| July 26, 2022 | $5,000 |
| August 26, 2022 | $6,100 |

18.    Based on documents I reviewed, the $1,100 payment made on or about July 25, 2022 was made by an individual, referred to herein as Investor 1, who had previously provided financing for Zola and who understood that she was SINGH's "partner" in the ownership of

5

Zola. Investor 1 maintained a bank account at Bank 2 in the Northern District of California. Based on records obtained from Investor 1 and from Bank 2, on or about July 25, 2022, Investor 1 initiated an electronic transfer from her Bank 2 account ending in -6754 to Victim 1's Bank 3 account in New York ending in -2618.

19. During the diligence process SINGH provided Victim 1 (either directly or through the business brokers) false information that created the false impression that Zola was an operational hospice business with a track record of being paid by Medicare that had millions of dollars of unpaid but soon to be paid invoices for hospice services Zola had provided patients. For example:

    a. SINGH represented that Zola had purchased Hospice Company 1, and its license to operate, in April 2022, allowing Zola to begin providing patient services in May 2022. To support this claim, SINGH appears to have altered the transaction documents she entered with Hospice Company 1. Unlike the versions of the documents provided by Hospice Company 1, the documents Singh provided to Victim 1 backdated the agreements from June 8, 2022 to April 28, 2022, and changed the terms regarding the purchase price and form of payment. SINGH also provided a document purporting to be a copy of a cashier's check in the amount of $655,000 dated April 28, 2022 signed by Darline Singh to Hospice Company 1's owner. In reality, Zola and SINGH never paid for Hospice Company 1, did not complete the purchase, and Zola did not have a license to provide hospice services.

    b. SINGH represented that Zola admitted 95 patients in May 2022, was continuing to enroll patients, and provided patient lists that included information about specific patients and the amount billed per patient. In reality, based on interviews with Zola employees, the fact that Zola lacked a license, and the fact that Zola's bank accounts never received payments for patient care, Zola never enrolled a single patient.

6

c. SINGH provided documents purporting to be patient referrals and admission consents signed by a doctor or a nurse.  Based on interviews with the providers whose purported signatures were on the documents, the documents did not reflect actual referrals or admissions because the providers denied ever making any referrals to Zola or signing the documents in question.

d. SINGH provided a document purporting to be an invoice issued by Zola to Medicare Billing Claims Notice of Elections, dated May 6, 2022 in the amount of $1,568,000.  SINGH also provided a document purporting to show activity for Zola's Bank 1 account ending -6697 showing a mobile check deposit of $1,568,000 on August 17, 2022 and another document that purported to show the front and back of a check from Medicare Senior Advantage United Healthcare to Zola dated August 12, 2022 in the amount of "$1568000" with the memo line stating "Zola Hospice May 2022 1 of 3 pmts."  These documents appear to have been forged by SINGH, as statements for the Zola Bank 1 account ending -6697 show no such deposit.

e. SINGH provided several documents purporting to be additional invoices Zola issued to Medicare for patient services in the total amount of over $4 million dollars.  SINGH also provided spreadsheets containing false financial information for Zola including that Zola had received over $8 million in payments and had over $4.5 million in outstanding accounts receivable.

20. On or about October 12, 2022, SINGH and Victim 1 executed a non-recourse factoring and security agreement.  SINGH then provided Victim 1 with an invoice that she purported had been issued to Medicare on October 31, 2022 in the amount of $4,735,601, consolidating prior invoices.  Victim 1 agreed to purchase the invoice and provide Zola an advance of $3,000,000.  Before Victim 1 provided the funds SINGH certified that the schedule of accounts and documents she submitted were "true, accurate, and complete." Based on the

evidence that Zola never provided any patient services, never had a license to operate, and never invoiced Medicare, SINGH's certification appears to have been false.

21.    On or about November 8, 2022, Victim 1 initiated an electronic wire transaction to send $2,440,000 to a Zola account controlled by SINGH at Bank 4.  On or about November 10, 2022, Victim 1 initiated an electronic wire transaction to send $500,000 to Zola's account at Bank 4.

22.    SINGH then quickly dissipated the money she fraudulently obtained from Victim 1.  Among other things, SINGH purchased two luxury cars, sent money to her mother, made an approximately $60,000 purchase on Airbnb, and purchased multiple hospice businesses.

## C. Use of Interstate Wires

23.    As part of the scheme to defraud described above, SINGH caused multiple interstate wire transmissions, including:

    a.    On or about July 15, 2022, SINGH caused Investor 1 to transfer $1,100 to Victim 1, which was routed electronically from Investor 1's bank accounts at Bank 2 ending -6754 in the Northern District of California to Victim 1's account at Bank 3 ending in -2618 in New York.

## D. Monetary Transaction with Proceeds of Fraud Scheme

24.    According to bank statements obtained from Bank 4, prior to Victim 1 wiring funds to Zola's account on or about November 8 and November 10, 2022, the balance of the account was approximately $1.37.  There was a returned check for the value of $26,739 that briefly sent the balance to negative $26,737.37.  After the wire transfers by Victim 1, SINGH used more than $10,000 of the proceeds to purchase a luxury vehicle.  According to records from Bank 4, on or about November 12, 2022, Singh transferred $61,226.69 from Zola's Bank 4 account ending -9391 to Automobile Dealer 1's Bank 1 account located in the Northern District of California.

8

**CONCLUSION**

25.    Based on the foregoing, it is my opinion that there is probable cause to believe that SINGH committed Wire Fraud, in violation of 18 U.S.C. § 1343, and Money Laundering, in violation of 18 U.S.C. § 1957.  Accordingly, I respectfully request that a warrant for the arrest of SINGH be issued.

**REQUEST FOR SEALING**

26.    I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including this affidavit. I believe that sealing is necessary in order to effectuate the orderly arrest of SINGH and in order to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.


_/s/ Christopher Calley_____
CHRISTOPHER CALLEY
Special Agent
Federal Bureau of Investigation


Sworn to before me over the telephone and signed by me pursuant to Federal Rule of Criminal Procedure 4.1 and 4(d) on this 22nd day of April 2026.  This application and warrant are to be filed under seal.


_____
HON. KANDIS A. WESTMORE
United States Magistrate Judge